

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | **INFORMATION** |
| ) | |
| Plaintiff, ) | |
| ) | 1:18 CR 743 |
| v. ) | CASE NO._____ |
| ) | |
| JENNIFER DILLARD ) | Title 18, Sections 1343, 1349, |
| and ) | and 2, United States Code |
| KENT REYNOLDS, ) | |
| ) | |
| Defendants. | JUDGE GAUGHAN |

### GENERAL ALLEGATIONS

*Defendants*

1. Defendant KENT REYNOLDS ("REYNOLDS") was a United States citizen and a resident of Alabama. REYNOLDS was the owner of Arrow Construction Group, LLC ("Arrow"), which was registered to conduct business in the state of Florida.

2. Defendant JENNIFER DILLARD ("DILLARD") was a United States citizen and a resident of Florida. DILLARD was the spouse of REYNOLDS and the vice president of Arrow.

3. Co-conspirator 1 ("CC-1") was the vice-chairman, vice-president and registered agent of Company 1 ("Company 1").

*Government Agencies*

4. The United States Navy ("USN") was a military service of the United States and the Naval Facilities Engineering Command ("NAVFAC") was the USN command responsible for planning, building and maintenance of USN facilities.

5. The United States Small Business Administration ("SBA") was created to aid, counsel, assist and protect the interests of small business concerns. The SBA administered a number of government contracting programs including the 8(a) Business Development Program. The program directed government contracts to eligible small businesses while limiting competition from larger, ineligible businesses.

6. The Defense Finance and Accounting Service ("DFAS") was the agency of the United States Department of Defense ("DOD") responsible for payments to DOD and military services, including the USN, vendors and contractors.

## Background

*Federal Contracting Programs*

7. To accomplish their missions as established by Congress, federal departments and agencies, to include the USN, contracted with businesses to furnish goods and services. Congress directed that a substantial portion of these contracts be awarded to small businesses. SBA worked with Federal agencies to award at least 23 percent of all prime government contracts to small businesses, with specific statutory goals, among others, for small disadvantaged businesses.

8. To meet the statutory requirement that a certain percentage of prime contracts be awarded to small businesses, federal departments and agencies used "sole-source" and "set-aside" awards to reserve certain contracts exclusively for small businesses, the awarding of such contracts usually being done through negotiation with the small business. A "sole-source" award

2

was directed to a specific small business and a "set-aside" award was limited to a particular category of businesses that met the relevant SBA program participation criteria.

9. Small businesses seeking sole-source and set-aside contracts under the programs were required to certify their eligibility to be awarded such contracts. Certifications and representations concerning eligibility to participate were made through U.S. General Services Administration computer systems, to include the Central Contractor Registry ("CCR"), the Online Representations and Certifications Application ("ORCA"), and the System for Award Management ("SAM").

*8(a) Business Development Program*

10. The 8(a) Business Development Program ("8(a) Program") was a business assistance program for small disadvantaged businesses administered by the SBA. Participation in the 8(a) Program was divided into two phases over nine years: a four-year developmental stage followed by a five-year transition stage after which a business graduated from the program and was no longer eligible for further 8(a) Program awards. 8(a) Program participants could obtain sole-source contracts and submit offers for contracts that were set-aside for 8(a) Program participants.

11. To have been eligible to participate in the 8(a) Program, businesses must have met a number of criteria, including being at least 51 percent unconditionally owned and controlled by socially and economically disadvantaged individuals as defined by SBA regulations.

12. A business seeking to participate in the 8(a) Program must submit an application to SBA. SBA determined whether the listed owner was a disadvantaged person (socially and economically), whether the business was properly formed, and whether the owner was otherwise eligible. The applicant must provide information to show the business had potential for success, such as lists of earlier contracts and information concerning capitalization and financial

3

resources. The applicant must also report any affiliations, such as indemnification agreements, because those affiliations could show that someone other than the disadvantaged person was in control of the business. At all relevant times, SBA depended on the truthfulness and honesty of the applicants and depended on the applicants to immediately notify SBA if there were any changes to the application that would affect program eligibility.

*Surety Bond Requirements on Federal Projects*

13. Any Federal construction contract valued at $150,000 or more required a surety bond when bidding or as a condition of contract award. A surety bond ensured contract completion in the event of contractor default. The contractor obtained a surety bond from a surety company. If the contractor defaulted, the surety company was obligated to find another contractor to complete the contract or compensate the project owner for the financial loss incurred.

14. There were four types of surety bonds:

   a. A Bid Bond ensured that the bidder on a contract would enter into the contract and furnish the required payment and performance bonds if awarded the contract;

   b. A Payment Bond ensured suppliers and subcontractors were paid for work performed under the contract;

   c. A Performance Bond ensured the contract was completed in accordance with the terms and conditions of the contract; and

   d. An Ancillary Bond ensured requirements integral to the contract, but not directly performance-related, were performed.

4

## Corporate Entities

*Arrow*

15. Arrow was organized in or around March 2006 in the state of Alabama. On or about June 20, 2007, it was registered to conduct business in the state of Florida with a listed address in Marianna, Florida. REYNOLDS was listed as the registered agent and managing member of Arrow.

16. From on or about February 4, 2008, until on or about February 4, 2017, Arrow was enrolled in the 8(a) Program and was eligible to receive set-aside and sole-source government contracts, and form joint ventures and team with other companies to bid on government contracts.

17. REYNOLDS was the "Disadvantaged Owner" of Arrow.

*Company 1*

18. From on or about March 19, 1997, until on or about September 25, 2015, Company 1 was incorporated and registered to conduct business in the state of Florida with a listed address in Chipley, Florida. CC-1 was listed as the vice-chairman of Company 1's board of directors and vice-president.

19. From on or about December 28, 2000, until on or about December 28, 2009, Company 1 was enrolled in the 8(a) Program and was eligible to receive certain set-aside and sole-source government contracts, and form joint ventures and team with other companies to bid on government contracts.

20. On or about December 28, 2009, Company 1 graduated from the 8(a) Business Development Program and was no longer able to compete for small business set-aside or sole-source contracts.

## Bonding and Pass-Through Schemes

*Pass-through Companies*

21. Pass-through companies violated the intent and purpose of the 8(a) Program. Pass-through schemes typically consisted of a program-eligible company being used by an ineligible company to qualify for and obtain 8(a) Program set-aside or sole source contracts. The program-eligible company then "passed" the work and the majority of the benefits of the contract to the ineligible company. The involvement of the ineligible company, and the true nature of its relationship with the program-eligible company, was not disclosed to the government agencies responsible for oversight of the 8(a) Program and participants or the agencies or departments awarding or managing the contracts. The two companies often had overlapping employees. This type of scheme often involved at least two purportedly different companies.

*Back-Bonding Pass-through Companies*

22. Back-bonding was prohibited under the 8(a) Program regulations. Back-bonding schemes typically involved a pass-through company that cannot obtain the necessary bonding to bid on a government contract. The pass-through company used an ineligible company's established bonding capacity with an insurance company to obtain the required bonds. Sometimes, the pass-through company passed the work and the majority of the benefits of the contract to the ineligible company in exchange for a fee. Back-bonding agreements, either verbal or in writing, were not shared with the government agencies responsible for oversight of the 8(a) Program and participants or the agencies or departments awarding or managing the contracts. Thus, the government was not aware of the ineligible company's role or involvement, nor was the government aware that the purportedly qualified company could not supply a sufficient bond to ensure contract performance. This type of scheme would typically involve at least two purportedly different companies.

## DEFENDANTS' SCHEMES TO DEFRAUD

23. REYNOLDS, DILLARD, CC-1 and others engaged in a scheme designed to submit false claims and defraud the United States by obtaining a government contract set-aside for qualified companies, to which they were otherwise ineligible to obtain, by fraudulently using a proxy and pass-through company.

24. REYNOLDS, DILLARD, CC-1 and others defrauded the United States by obtaining an 8(a) Program set-aside contract by using a purportedly qualified 8(a) Program eligible company as a proxy to bid and obtain a set-aside contract. The proxy would then pass-through the majority of the benefits and obligations of the contract to an ineligible company in exchange for bonding capacity because the proxy company could not obtain the required bonds on their own.

25. On or about September 26, 2011, NAVFAC contract N69450-11-C-2269 was awarded to Arrow, with an initial value of approximately $2,827,176.41, to "Design/Build Test Track Repairs & Safety Upgrades" ("Test Track contract") at Marine Corps Logistics Base (MCLB), Albany, Georgia. The final contract value was approximately $2,853,111.41.

26. On or about September 26, 2011, DILLARD, vice-president of Arrow, signed the contract. CC-1, REYNOLDS and DILLARD failed to disclose to SBA that CC-1 and Company 1 used their bonding capacity to back-bond Arrow. CC-1, REYNOLDS and DILLARD also failed to disclose to NAVFAC that the majority of the Test Track contract was being sub-contracted to Company 1 to conceal that Arrow was acting as a pass-through for Company 1 on the contract.

27. On or about September 29, 2011, Arrow, DILLARD, REYNOLDS, CC-1, Company 1 and others executed a general indemnity agreement with an insurance company in order to obtain bonds for Arrow contracts and concealed that arrangement from SBA officials.

28. On or about July 31, 2012, REYNOLDS, DILLARD and CC-1 caused the transfer of 49 percent of the ownership of Arrow to CC-1 and REYNOLDS relinquished 51 percent of his voting rights in Arrow to CC-1, giving CC-1 total management control of Arrow and concealed that arrangement from SBA officials.

29. On or about November 13, 2012, REYNOLDS, DILLARD and CC-1 sent and caused to be sent an approximately $587,175.83 invoice for payment to NAVFAC from Arrow. On or about December 3, 2012, REYNOLDS, DILLARD and CC-1 caused the issuance of a check to Company 1 for approximately $537,290 out of the approximately $587,290 Arrow received from DFAS-Cleveland in the Northern District of Ohio for payment of an invoice Arrow submitted to NAVFAC on or about November 13, 2012.

30. On or about April 30, 2013, REYNOLDS, DILLARD and CC-1 sent and caused to be sent an approximately $713,705.07 invoice for payment to NAVFAC from Arrow. On or about July 3, 2013, REYNOLDS, DILLARD and CC-1 caused the transfer of approximately $706,314.11 from Arrow's bank account to Company 1's bank account from the approximately $713,814.11 that Arrow received from DFAS-Cleveland in the Northern District of Ohio for payment of Arrow's invoice submitted to NAVFAC on or about April 30, 2013.

31. On or about January 15, 2014, REYNOLDS, DILLARD and CC-1 caused Arrow to change the payment information in the SAM that specified the bank account the government was to deposit contract payments from Arrow accounts at Hancock Bank to a Company 1 account at PeopleSouth Bank.

32. On or about January 30, 2014, REYNOLDS, DILLARD and CC-1 sent and caused to be sent an approximately $298,952.45 invoice for payment to NAVFAC from Arrow. On or about May 19, 2014, REYNOLDS, DILLARD and CC-1 caused DFAS-Cleveland, located

in the Northern District of Ohio, to deposit approximately $298,952.45, which was payment for the Arrow invoice submitted to NAVFAC on or about March 27, 2014, in Company 1's bank account at PeopleSouth Bank.

33. As a result of the scheme, NAVFAC paid Arrow approximately $2,853,131 for a contract for which Arrow was otherwise ineligible. REYNOLDS, DILLARD and CC-1 agreed to pass-through approximately 90 percent of the value of the contract to CC-1 and Company 1, in violation of the terms of the contract and 8(a) Program regulations.

<u>COUNT 1</u>
(Conspiracy to Commit Wire Fraud, 18 U.S.C. §§ 1343 and 1349)

The United States Attorney charges:

34. Paragraphs 1 through 33 of the Information are re-alleged and incorporated by reference as if fully set forth herein.

**The Conspiracy**

35. From on or about September 26, 2011, through on or about May 19, 2014, in the Northern District of Ohio, Eastern Division and elsewhere, Defendants KENT REYNOLDS, JENNIFER DILLARD, and others presently known and unknown, did knowingly combine, conspire, confederate, and agree to devise and intend to devise a scheme and artifice to defraud and to obtain money and property, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, to transmit and cause to be transmitted by means of wire communications in interstate and foreign commerce, certain writings, signals, signs, pictures and sounds: that is, to knowingly cause interstate wire communications to be made in furtherance of said scheme and artifice to defraud, all in violation of Title 18, United States Code, Section 1343.

**Object of the Conspiracy**

36. It was an object of the conspiracy for REYNOLDS, DILLARD, and others known and unknown to enrich themselves by obtaining government contracts they were ineligible to receive, to wit: USN, NAVFAC sole source 8(a) set-aside contract number N69450-11-C-2269, awarded on or about September 26, 2011, which had an initial value of approximately $2,827,176.41.

**Manner and Means of the Conspiracy**

It was part of the scheme and artifice that:

37. REYNOLDS, DILLARD and others known and unknown, made false representations and provided false documents to the SBA and USN to receive the 8(a) contract.

38. REYNOLDS, DILLARD and others known and unknown, made false representations and provided false documents to the SBA regarding CC-1's leadership, management, and ownership interests in Arrow, a potentially program eligible company, in order to have the SBA approve, reinstate, or maintain Arrow in the 8(a) Program.

39. REYNOLDS, DILLARD and others known and unknown, used Arrow's status in the 8(a) Program to serve as a proxy to obtain a pass-through contract with the United States.

40. REYNOLDS, DILLARD and others known and unknown, made false representations and provided false documents to the SBA and USN regarding the bonding capacity of, and CC-1's involvement in obtaining bonds for, Arrow in order to ensure that Arrow would be eligible to bid for and obtain contracts with the government.

41. REYNOLDS, DILLARD and others known and unknown used the fraudulently and falsely obtained 8(a) Program status of Arrow to obtain government contracts for which they were otherwise ineligible or incapable of obtaining.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2
## (Wire Fraud, 18 U.S.C. § 1343 and 2)

The United States Attorney further charges:

42. Paragraphs 1 through 33 of the Information are re-alleged and incorporated by reference as if fully set forth herein.

43. From on or about September 26, 2011, through on or about May 19, 2014, Defendants REYNOLDS, DILLARD, and others devised and intended to devise a scheme to defraud the United States, and the United States Navy, to obtain money and property by means of materially false and fraudulent pretenses, representations and promises.

### Execution of the Scheme

44. On or about May 19, 2014, in the Northern District of Ohio and elsewhere, Defendants REYNOLDS, DILLARD, and others for the purpose of executing the scheme described above, caused to be transmitted by means of wire communication in interstate commerce the signals and sounds described below:

| Count | Originating Location | Recipient Location | Description |
|---|---|---|---|
| 2 | DFAS Cleveland, OH | PeopleSouth Bank Colquitt, GA | $298,952.45 |

In violation of Title 18, United States Code, Sections 1343 and 2.

JUSTIN E. HERDMAN
United States Attorney

By: *Michael L. Collyer*
Michael L. Collyer, Chief
White Collar Crimes Unit

11